The case on the docket is 2-16-0941, people of the state of Illinois, plaintiff at the age of 10, S. Kemokai, defendants of Penance. Arguing on behalf of the defendants of Penance, Mr. Christopher N. McCoy. Arguing on behalf of the plaintiff's family, Ms. Diane L. Gaffney. Are both sides ready to proceed? You may proceed when you're ready, but you had a motion, correct? I did do a motion to proceed when you're ready. And that was served on counsel? Did you have an objection? I can address it in my argument. No, to the file. I don't have an objection to the file. Okay, then the motion will be granted. You may proceed when you're ready, then. May it please the Court? Counsel? My name is Christopher McCoy from the Office of the State Appellate Defender, and I represent Ms. Justina Kemokai. In our brief, we raised four issues. The first was about the summary spreadsheets. The second, the proof of value of over $100,000. The third was the improper sentencing factor. And the final issue involved $5 per day credit against fines. This Court no longer has to address the merits of that fourth issue because subsequent to the filing of our brief, the Supreme Court enacted Rule 472, which counsel cited in her motion. And now the proper remedy for that issue is for this Court to remand the case to the trial court so that Ms. Kemokai can file the appropriate motion. On the remaining three issues, today I would like to focus on the two trial issues primarily. Obviously, if this Court has any questions on the sentencing issue, I would be happy to address those as well. But, again, I'd like to focus primarily on the first two issues. And I'll begin with the State's motion to cite additional authority, which, regarding the first issue, cited Rules of Evidence 703 and 704. In short, neither one of these rules applied in this case, and in a way, they illustrate what the problem was here. Rule 703 allows an expert to rely on inadmissible evidence in formulating his or her opinion. The problem here, though, wasn't that Detective Newman relied on inadmissible evidence. The problem was that he created inadmissible evidence. He was the one who created the spreadsheet, which is, again, the problem that we have in this case. Likewise, Rule 704 allows an expert to testify to his opinion on an ultimate fact of the case. This rule doesn't apply for two reasons. First, the trial judge in this case specifically prohibited Detective Newman from testifying as to his opinion on whether or not the Stearns were victims of fraud. And second, Detective Newman wasn't testifying to his opinion. What he did was put what was essentially an inadmissible opinion into the summary spreadsheets, and so it appeared to the jury as if this opinion were a documented, established fact. The trial counsel who was successful in limiting the officer's opinion didn't object to this. He did object to this. He objected. Let me take a step back. The defendant's motion to eliminate only addressed the ATM spreadsheet, but the state's motion to eliminate was asking for all of these spreadsheets to be admitted to evidence under Rule 1006. So their admissibility was before the trial court. And at the hearing on the motion to eliminate, defense counsel specifically objected to bringing in all of the spreadsheets. He objected to, at trial, Exhibit No. 60, and said that that was the detective's work. That's not the work of Bank of America, which is essentially the same objection that we're raising here. I thought hearing you raising the objection mainly to the headings is fraudulent and unauthorized. Correct. And the problem with those is that the – that was the detective's opinion. Those were merely – And that would have been easily rectified had it been objected to. They just sort of got a black marker and marked out unauthorized. Well, he – the defense – again, defense counsel specifically said regarding Exhibit No. 60, that's his work, meaning Detective Newman's work. That's not the work of Bank of America. So he did not use the word unauthorized, but that is the essence of the objection that we're making here on appeal, that the – these labels were improper. The notes column on Objective – excuse me, Exhibit No. 60 was also specifically objected to, the fact that the detective wrote on several transactions. Stearns left alone. The trial judge overruled that objection, did not omit it. And the defense counsel further objected in the motion for new trial to – citing Rule 403, that the prejudicial value outweighed the – or prejudicial effect outweighed the appropriate value. I thought the post-trial motion, the defense only objected to the ATM example. In the written post-trial motion, that's the only one that is mentioned. However, at the hearing on the motion for new trial, defense counsel argued about the summary sheets. And likewise, the state was referring to the summary spreadsheets. The trial court's ruling on the motion for new trial was not limited to that – to the one ATM spreadsheet. And furthermore, the – on appeal, the objection does not have to be identical to the objection in the court below. We cite, in our brief – in our reply brief, People v. Harris, which is a 2014 opinion from this court, where, in that case, the defense counsel objected on hearsay grounds, never specifically said that he was objecting on a lack of foundation. But this court held that that – the lack of foundation was apparent from the context, and both the court and the state understood the nature of the objection. So this court held in Harris that there was no forfeiture. And the same reasoning applies here. The parties of the court understood the nature of the objection and what defense counsel was – had his problem with. What's the purpose of the forfeiture rule? The purpose of the forfeiture rule is to give the trial judge the opportunity to rule on the merits of the objection. And again, wouldn't this have been quite easily rectified had it been raised? The issue that you're raising, I'm feeling. Well, our argument is that it was raised and that the trial judge did not choose to – Wait, wait, wait. I mean, I'm talking about the specific objection of the words unauthorized and fraudulent about the exemptions. That was not raised. I mean, again, that could have – even you state in your brief that that could have been easily taken care of by the trial judge. It could have been easily taken care of. With a black market. Our position is that the judge chose not to correct that. It chose just to put the spreadsheet in front of the jury as it was. At the motion and eliminate hearing, defense counsel, regarding the American Express credit card, specifically pointed out that written on top of that exhibit was the term fraud and fraud investigation. And no one determined that it had been fraud. Which exhibit are you referring to? The – that would be exhibit number 64, where it says that is regarding the American Express credit card. And on top it says fraud claim, and then it has another column listed as fraudulent charges. And, again, at that motion and eliminate hearing, defense counsel specifically pointed out that the detective's opinion on fraud was an ultimate issue for the jury to determine. If this had said – look at people's exhibit 64. If this had said alleged fraudulent charge, would that have been okay? Yes. That would have been – that would have been sufficient. And the same would go with people's exhibit 60, where it says Bernard Hills, Illinois, Walmart, unauthorized credit card charges. If that had said allegedly unauthorized credit card charges, that would have been okay? I think for that specific example, number 60, just eliminating the word unauthorized would have been the best way to take care of that. If you look at, for example, exhibit number 59, 61, 62, those are all similar exhibits listing different credit card charges, and they just don't contain the word unauthorized. And there's no suggestion that they were incomplete or that the jury was unable to understand them. Didn't these exhibits simply mirror the testimony as to what was allegedly unauthorized and fraudulent? Well, yes and no. Regarding the checks that were written to the defendants, in that regard, the detective did explain his process for determining – for concluding what was duplicative pay and what was authorized pay. However, regarding the credit cards, and especially exhibit number 64, there was really little to no explanation for how Detective Newman determined which charges were fraudulent charges and which charges were authorized. Now, the state at trial picked out a few of the most egregious examples, the multiple pieces of lingerie, the high-heeled shoes. But there's many other examples where, in the record, and certainly the jury had no idea how Detective Newman came to this conclusion. In our brief, we cite – defense counsel could have asked him line by line how he got to his conclusions. Well, addressing that he could have done so, I mean, addressing Justice Burke's question, the jury – and again, I'm specifically referring to exhibit number 64 – all they had to go on is, for a lot of these transactions, is detectives, you know, just this conclusory statement that these are fraudulent charges. In our brief, we raised one example. There was a purchase at Costco of $235.95, of which the state argued that $200.42 were authorized. There's no way to determine how the judge – or excuse me, how the detective reached that conclusion. The receipt from that particular transaction was not introduced into evidence. I mean, the jury had nothing to go on except the detective's conclusion, fraudulent charge. And when that is included in the summary spreadsheet, it becomes more than just testimony or just opinion. It is now, in the eyes of lay jurors, an established, documented fact. I mean, they – there's a reason we allow summary spreadsheets to be admitted at trial. It's because a lay juror is going to look at this nice, neat Excel spreadsheet and not pay attention to this pile of financial documents and credit card receipts. And so when the jury repeatedly sees the words false, fraudulent, unauthorized, that's going to taint their evaluation of the evidence. And they're no longer going to look at the serious questions of – in this case, especially regarding value and instead just accept the police officer's conclusion. Are you conceding that the state proved beyond a reasonable doubt that your client did commit a theft or thefts? The issue is valid. We're not. The only issue – the only element we're alleging regarding sufficiency of evidence is value, so yes. And turning to that second point, the value of over $100,000, there are three main types of transactions the state was using to reach that value. The credit card transactions, the checks, and the ATM withdrawals. So the total from the checks and the credit cards was $57,495.23. So from the ATM withdrawals – excuse me – the state needed $42,504.77. And quite simply, there was just no evidence at trial to show that this high amount of the ATM withdrawals were actually unauthorized. The state's own victim, Eugene Stern, testified that he authorized the defendants – that he gave them permission to use his ATM card to get money to pay for household expenses like groceries and dry cleaning. And this is actually consistent with Ms. Kimokai's initial statement to the officers. That's a lot of groceries and dry cleaning. $72,000 worth of groceries and dry cleaning? Well, those were just the two examples that Mr. Stern first came up with. He said there were other things that he just could not think of at that moment. And still, I mean, we're talking about taking out some ATM to do some – get some household expenses to the tune of $72,000 in a little over two years. Well, it's – my calculation was that every ATM withdrawal over three and a half years that the defendant worked there. And the state made no effort to distinguish what amount of this cash was authorized and what – Exhibit 56 was the ATM withdrawals for the eight months preceding her employment, correct? Right. And that was a grand total in eight months of $380. Correct. And then after she's employed there, pardon me, about three and a half years, $72,000. And this is kind of a big difference. Yeah, absolutely is. But there were also major changes in Mr. Stern's life at that time. First of all, they now had caregivers to go to the store for them to pay their expenses. And as Eugene testified, the way he was now paying for his household expenses, groceries and whatnot, was to give the caregivers cash to give them his ATM card. And so, yes, he wasn't using his ATM card before, but now how he is living his life has changed. So you would expect to see some type of change. And that's what he testifies to. That's the statement that Ms. Kimokai gives the officers. And furthermore, their son, Robert, the Stern's son, Robert, was having financial troubles at that time. Eugene was paying his mortgage. He was giving him cash. So there are – Wait a minute. Didn't he testify that only one time did – the son testified that only on one occasion did his father give him cash? Correct. Eugene testified that he gave him both cash and checks. So in any case, there are still major life changes in the victims' lives, which explain this. And, again, ultimately what the state did was they gave every single ATM transaction over these three and a half years. We don't even know that Ms. Kimokai was the one making all of these transactions, even on the day she's working. And there's just no – just an absence of evidence to be able to say which portions were authorized and which weren't. Well, I'll agree with you that it's not conclusive as to every single transaction. There was not a video for every transaction. But isn't all of that what the jury is supposed to do and determine the credibility of the totality of the evidence? Well, the jury is allowed to draw inferences from the evidence. However, it has to be a reasonable inference. And the jury is not allowed to draw an inference absent any evidence. And that was the case here. There's just no specifics given to where this money goes after it's withdrawn from the ATM machine. Well, I guess my point is that isn't that circumstantial evidence that prior to her employment, it's a total of, you know, $300 and some. After her employment, it goes to $72,000? It may be circumstantial evidence. But given the other facts in this case and what was going on with the Stearns, that's not proof beyond a reasonable doubt to reach the high level of $42,000 that she's given. There's no proof that she's given this outlandish lifestyle or any evidence of her financials that she's depositing this money after she withdraws it from the Stearns ATM. So, again, whatever minimal evidence there was here was not sufficient to reach the high burden of beyond a reasonable doubt of exceeding $42,000. You will have a chance to vote. Good morning, Your Honors. First of all, I'd like to give a brief quote from the trial judge on the motion to reconsider. This is at R1984-85. Her basic theory of this entire case, which I once again find beyond ridiculous, is that the Stearns were actually paying her to buy things for their house, which completely is belied by the financial records, and that the Stearns were gifting her all of these various funds, which, once again, is completely belied by the records. Your Honors, you were, I think, very astute in pointing out the difference between the pre-helper expenses on the ATM, which were $380,000, and the post, which were $72,000. Again, it is a matter, in large part, of credibility of the witnesses, and that, in this case, the jury was the finder or trier of fact. But the trial judge, who was also present and had access to the same information, testimony, credibility assessments, made that statement. So I think that's rather telling. I'd also like to quote. This is actually in the reply brief at page 5. Defense counsel quoted from Wisnecki. We emphasize that because summaries are admissible as evidence under both federal rules of evidence 1006 and in Illinois, care must be taken to admit argumentative and conclusive matter in their preparation lest a jury be misled. As for the cover-up and stolen headings in the instant case, they accurately explained the significance that the expert attached to those dollar amounts. In this sense, the headings reflected certain assumptions on the expert's part, but these assumptions were amply supported by the evidence already before the court. Moreover, we do not find that the characterization in the headings prejudiced the defendant or unduly influenced the court. Here, the purpose of the summaries is to give some sort of handle on the reluctantness records. Here, there is support for the various charges. Otherwise, we would not know that on one occasion the defendant got six pairs of high-heeled shoes on the credit card. The trial court barred the officer's opinion of the ultimate fact of whether these were authorized or unauthorized, correct? Yes. So why then could the officer throw up an exhibit that he prepared that says they were unauthorized? In this case, I think that in part is why I cited Rule of Evidence 704. The Illinois Rules of Evidence were effected in 2011, which is well past the date of both of the two primary cases that we referred to. So in this case, it all goes to part of my forfeiture argument, which your honors were also pointing out that in particular with the summaries or with the headings, that could have been easily remedied by a bottle of white-out or a black magic marker. But those specific objections were not made. In fact, in the NAWADI, the defense counsel did specifically object, arguing that the labeling was prejudicial and addressed an ultimate issue in the case. And the court overruled that objection. Had that specific objection been made by this defense counsel, it could have easily been remedied defense counsel. Well, is it prejudicial? Are those labels prejudicial? I don't believe so. Well, let me put it to the other way. How is it fair? It is fair because in this case, the jury was well aware that the summary was prepared by Detective Newman. But that's the whole point. He's barred from making the ultimate conclusion in his testimony, so we put it on the label. Isn't that basically a violation of the court's ruling to not have him testify to the ultimate conclusion? In this case, I don't think so. At most, it would have been an invertent. The documents were prepared well in advance, and they were given out months, a long time before the trial. So everyone had them, could assess that. Everyone knew that Detective Newman was, in fact, the policeman investigating. I don't think it would be shocking to the jury that in the process of assessing all of these and making his summaries, going through all of the credit card receipts, et cetera, et cetera, et cetera, the ATM withdrawals, that he was choosing only those items that he thought were improper or unauthorized. And I think that's sort of inherent in his expertise, and that's part of what is in Wisniewski. What about the notation on Exhibit 60 where he says, while she goes to the store, obviously? I mean, of what relevance is that? In this case, it does have some relevance because part of the argument is whether or not she was making authorized withdrawals. And part of the videos showed her in the car with the wife. So it's not the strongest point. It certainly wasn't emphasized to any great extent at the hearing. So the judge made an assessment. He heard the argument. He didn't find it unduly prejudicial. So he did do a balancing. And Gene testified that he did give the defendant the ATM card for household expenses, correct? He did, but he made a couple other statements, and these are on my brief at page 27 and 28. He said that he did not directly give the defendant permission to use his ATM cards to withdraw cash, and that's at C752. When asked if he gave permission to use the credit cards to purchase items for the defendant herself for $33,000, he stated, not that I recall. And he did not remember giving her permission to withdraw $73,000 at the ATM. So certainly we have, defense counsel and I have dueling authority. I noted in Johnson that the jury is free to believe as much or as little as it pleases of a witness's testimony, and defense counsel said, I can't remember the exact quote, but, you know, you should consider, you know, the totality and not ignore just one part. But clearly here, the judge, the jury, your honors can view the deposition and make your own assessment. There was also expert testimony from the doctor regarding his condition and his cognitive impairment. So again, we have the contradictory testimony by the son. He, I believe, went with his father on one occasion to the ATM. Other than that, he got checks for the mortgage payments, et cetera. He said he didn't get cash from his father. So again, the jury had the opportunity to assess his credibility. It also had statements through the Detective Newman of statements made by the defendant herself. And that, in part, is what the trial judge is referring to when he made his statement in R1984 and 85. And the defendant's statements that Detective Newman relates are R1432 and R1433, and that she said that Eugene gave her his ATM and PIN, and she withdrew funds in his direction, and that the Stearns allowed her to buy clothing items for herself. But again, we then have Eugene's statement that he didn't recall giving her permission to charge $33,000 on the credit card and didn't recall giving her permission to withdraw $73,000 at the ATM. So I don't find those to be... Correct. So if you look at his being Eugene's testimony that he didn't give her $33,000 authority, no one's objecting to that. It's all these little incremental ones that the State chose to label with the ultimate conclusion for the jury. That's the heart of the issue here. Well, I think that's incorporated in, you know, it's also in the nature of the charge of financial exploitation of the elderly. And that's probably a good portion of the reason why the hiring service has a policy that their employees are not to ask for cash or... Agreed. That's some evidence. But violation of my employment agreement is not felony. True. But it goes to intent. And in this case, I think it is the trial courts, you know, it agreed with the $177,000 loss figure. And I think when you compare that with the $380,000 for the six or eight months prior to their working and the $73,000, and I think it is the two and a half years. Your honors can check that. But that's an overwhelming difference. And again, the trial court, the trial judge himself did not find her testimony to be in any way believable or credible. Again, you don't have... Okay. The reason for the summary is that the records are overwhelming. And I agree with that statement, having tried to look at all of them. That is why you have the summaries. The defense certainly had the opportunity to look at any particular charge and question. Defense counsel mentioned People's Exhibit No. 60. I mentioned that on page 5 of the brief. And first of all, the defendant didn't object. He objected to red marking on the page and the contents, not the phrase unauthorized. So again... He objected to... Sorry, say that again. He objected to the page and the contents, not the phrase unauthorized. That is just a little added thing for the forfeiture. But throughout the trial, the prosecutor is encouraging the jury to look at the underlying documents. They go through different transactions and they look at this exhibit, which is the summary list, and then refer to the particular transaction on the credit card statement to whether there's a video or not. So the jury has every opportunity to look at all of the underlying documentation. And then to compare that, and defense counsel likewise had the similar opportunity and could bring up any alleged errors. So the entire purpose of allowing the summaries is somewhat defeated if the state has to go through item by item by item and, you know, show each individual proof item. In this case... So your position that the jury should... Yeah, I get you. That's okay. The jury should just take the state's word for it? No. If we've got, you know, 1, 10, and 15, we talk about we should just take our word for the rest? No, no, no. So why shouldn't the state have to produce some testimony about all of the entries? They did. They produced all of the underlying documents. The summary and the specific... They encouraged the jury to, in fact, go back and look at any item. And just as an aid for how they would do that or to explain how it had occurred, they gave a number of examples and went through and, you know, did the comparison that the jury was fully encouraged to do on their own. By giving those examples and further testimony, they also testified to how the summary exhibits were prepared, correct? Correct. Any other questions? Thank you very much. Do you wish to reply? Regarding the first issue, one point I omitted in my opening statements was that if this Court finds that that issue were not preserved, it still can be considered as plain error under the closely balanced evidence prompt. And regarding the spreadsheets opposing counsel, cite Winooski, however, that case is distinguishable by its own reasoning. That was a bench trial. And the Court there said, quote, well, we recognize the powerful impression which charts and summaries can make upon a jury, vesting a summary with an air of credibility independent of evidence purported to be summarized. The Court in the instant case was cognizant of the defendant's allegations against the witness and was thus better able to weigh the importance of the spreadsheet. So the reasoning in Winooski is specifically premised on the fact that this is a bench trial and they recognize if we're dealing with a jury trial, these things are very powerful and very important. So that case, Winooski certainly doesn't control here. And counsel also mentioned the notes column, the sterns left alone. That was simply not relevant. The police officer admitted that that was an assumption, whether or not they were left alone. The trial court said it was not completely all that relevant. And whether or not the sterns were present just doesn't shed that much light on whether or not the transactions were authorized. At trial, the state argued that even when one of the sterns was present, some of these transactions were unauthorized. And Eugene testified, again, the state's own victim testified that he gave the defendant's permission to go to the store without him. So whether or not they're present is really minimally relevant at best. And it's not even a phrase of sterns present or sterns absent. It's sterns left alone. And that's where the prejudicial effect comes in. Because a lay juror hearing this and knowing all about their medical conditions is going to just think of the defendant as a bad person who's willing to risk the stern's physical health so that she can go shoe shopping. I mean, it's just the type of thing that sticks out to a juror and it should not have been admitted. Turning to the second issue, counsel was discussing the case I cited in my reply brief. That's People v. Gonzales. And what that court held was that we usually defer to a trial court's resolution of conflicting evidence. But whereas here the conflict was created by the same witness, we cannot defer and accept one definitive statement of a witness about an important issue and completely ignore the exact opposite definitive statement on the same issue by the same witness. And that's regarding Eugene's testimony, that's what the state's asking you to do here, to ignore his testimony that he gave permission to use the ATM card, that this was how he paid for his expenses, that this was a normal part of the caregiver's job. And ultimately, this really wasn't even a credibility contest. This isn't a he said, she said. This is, especially, and I'm now referring specifically to the value element, this is just an absence of evidence of the specifics of when, of what the money withdrawn from the ATM was used for. There's no allegation that the victims were physically neglected or that they were living in squalor or anything of that nature. So some money was going to, was being used to take care of the victims. We don't know how much. And it's important to remember, this is the state's burden of proof. It's proof beyond a reasonable doubt. It's not defense's job to cross-examine the police officer and find all the errors. Defense counsel, obviously this court is well aware, did not have to do anything. He could have sat there and forced the state to meet its burden of proof. And regarding the ATM withdrawals, they simply failed to do that. I mean, if you're paying household expenses, you generally don't withdraw, like, the same amount three times within three minutes, do you? Well, again, we're not sure. But of that, of those expenses, which were going to care for the Stearns, which were going, I mean, perhaps if there could be some suspicion that the defendant is taking some of it, we don't know how much. And when the dollar amount is an essential element of the charge, the state had to prove how much is going to the defendant. And there's just no way to know that from the evidence before the court. I know my time has expired. May I just have one moment to explain the remedy? It's a bit convoluted, given all of the issues in this case. Sure. If this court agrees with both our issues one and two, we're asking for a new trial in which the defendant can't be tried for theft of over $100,000. If only this court agrees with issue two, we're asking to reduce the conviction and remand the case for resentencing. And if this court only agrees with issue three, we're asking to either remand for resentencing or reduce Ms. Kimokai's sentence to five years, given how close she is to her MSR date. And finally, if the court does not agree with any of those, we'd rely on Rule 472 for a remand for the appropriate fines of these funds. Thank you. Thank you both very much. Excellent arguments on this case. We will be in recess until 930 at our next hearing.